**Adan Rangel ROSALES, Appellant,**

v.

**Marcello LARA et al., Appellees.**

**No. 930.**

Court of Civil Appeals of Texas,
Corpus Christi.

Jan. 30, 1975.

Rehearing Denied Feb. 20, 1975.

Clarence N. Stevenson, Fly, Moeller & Stevenson, Victoria, for appellant.

Robert J. ·Seerden, Seerden & Dietze, Victoria, for appellees.

OPINION

NYE, Chief Justice.

This is a personal injury case. Marcello Lara, individually and for his then minor

son, Johnny Lara, and Johnny Lara (now as an adult) brought suit against Adan Rangel Rosales for personal injuries, medical expenses and other damages as a result of an automobile-pedestrian accident. The case was tried before a jury which found that Rosales had committed several acts of negligence which were the proximate cause of Lara's damages. However, the jury also found that Johnny Lara was contributorily negligent in failing to keep a proper lookout which was a proximate cause of his injuries. The trial court upon proper motion disregarded the findings of the jury on the latter lookout and proximate cause issues and rendered judgment non obstante veredicto against Rosales and in favor of Lara. Rosales has perfected his appeal to this Court.

The evidence is virtually undisputed. Johnny Lara and his younger brother, Bernardo, were walking westerly on the paved shoulder of the Port Lavaca Highway in the City of Victoria. They were walking lawfully on the left or south side of the highway facing the on-coming traffic because there were no sidewalks along the highway.[1] Bernardo, the youngest of the two brothers, was walking the farthest from the main traveled portion of the roadway. Rosales was traveling in an easterly direction approaching the Lara boys. As he approached the area where Johnny and Bernardo were walking, Rosales turned off the roadway and onto the shoulder approaching the pedestrians head-on. Bernardo jumped to his left and managed to get out of the path of the on-coming car. However, Johnny was struck and suffered numerous injuries to his body, including a concussion to his head to the extent that it was impossible for him to remember what had happened in the accident.

The appellee Rosales presents three points of error. All of the parties agree

that the only question before this Court is whether there is any evidence to support the jury findings to the special issues of lookout and proximate cause which were disregarded by the trial court in entering its judgment in favor of Lara.

 When the trial court enters a judgment notwithstanding the verdict of the jury, the point of error on appeal is a no evidence point of law. In deciding this question, the appellate court must consider only the evidence and the inferences tending to support the finding and disregard all evidence and inferences to the contrary. Garza v. Alviar, 395 S.W.2d 821 (Tex. Sup.1965).

The undisputed evidence shows that appellant Rosales was driving his car on the Port Lavaca Highway immediately prior to the collision. The accident happened on Sunday, September 3, 1972, at a time in the evening when it was dark. Rosales had the lights on his car displayed. He pulled his car off the main portion of the highway onto the shoulder intending to enter a business establishment (either a drive-in. or a lounge), which was located along the Port Lavaca Highway.

The appellant and appellees quote extensively from the evidence in the statement of facts. Generally, both parties recite the same testimony in support of their opposing views that there was "some evidence" or there was "no evidence" of a failure to keep a proper lookout.

Taking only the pertinent quoted testimony from the appellant's brief in an effort to set out the undisputed evidence and that which would be most favorable to the jury verdict, we begin with the questioning of Bernardo Lara, Johnny's youngest brother.

"Q (by Mr. Seerden) So you and Johnny were going over to see your daddy?

1. Vernon's Tex.Rev.Civ.Stat.Ann. Art. 6701d Sec. 81(b) (1969) provides: "Where sidewalks are not provided any pedestrian walking along or upon a highway shall when possible walk only on the left side of the roadway or its shoulder facing traffic which may approach from the opposite direction."

A (by Bernardo Lara) Yes, sir.

Q What were you and Johnny doing as you walked along there just before this accident happened?

A We were talking and singing.

Q You were talking and singing?

A Yes.

Q Were you watching where you were going?

A Yes.

Q What was the traffic like?

A It was kind of busy, but not that busy.

Q Was it dark?

A Yes, sir.

Q When you got there in front of the Texas Drive Inn and Lee's Lounge did anything particularly unusual happen?

A An accident.

Q Did you see the car that hit Johnny?

A Yes, sir.

Q Tell the members of the jury, if you will, just what happened as you were walking along there where this happened.

A Well, we were walking because we were going over to my father's house and this car pulled out on the road, it was coming fast, and it hit my brother.

Q Did you see the car pull off of the road?

A Yes, sir.

Q How far from you was the car when it pulled off the road?

A I wouldn't know.

Q Was he far away from you or was he pretty close to you?

A He was pretty far away. Not that far, but pretty far.

Q When he pulled off the road did he travel down the shoulder of the road for some distance before he hit you?

A Yes, sir.

Q When you first saw the car did you know it was going to hit you?

A No, sir.

Q What did you do when you first saw the car?

A I kept on looking at it and then I took my eyes off the car. I thought it was going to the Texas. (drive-in establishment) There are two ways you can get in from the side and from the front, and I thought it was going to go through the back.

Q If you were driving you can go into the Texas Drive Inn by either coming in the front and parking in the front—

A Uh huh.

Q —or you can come and park on the side, is that correct?

A Yes. sir.

Q And you thought he was going to cut across the parking area from Lee's Lounge, is that right?

A Yes, sir.

Q Into the Texas Drive Inn?

A Yes.

Q When did you first realize the car was likely to hit somebody?

A By the sound of it.

Q What did you do then?

A I jumped and tried to grab my brother but I missed him.

Q You jumped and tried to grab your brother but you missed him?

A Yes sir."

Even though Johnny Lara could not remember any of the events of the accident at the time of trial, he did respond to the questions at the scene of the accident propounded to him by the patrol officer who investigated the accident, Officer Hatton.

"Q What did Johnny tell you at the time?

A He said they were walking in a west direction on the south side of the Port Lavaca Highway on the shoulder. His statement was he was six to eight feet from the roadway pavement edge on the shoulder. He was six to eight feet from the main-traveled portion walking on the shoulder with his brother. He said all of a sudden he saw a light-colored car coming at him. He attempted to get out of the way but couldn't and was hit."

* * * * * *

"Q (by Mr. Stevenson) In your conversation with Johnny Lara did he indicate to you what he did to try to get out of the way of the car when he first saw it?

A (by William Howard Hatton) No, sir, he just said he suddenly saw the car and attempted to get out of the way.

Q Did he tell you where the car was when he first saw it?

A No, sir, but I gathered from the way he talked it was in front of him coming at him.

Q Close?

A Yes, sir."

Bernardo, Johnny's youngest brother who was thirteen (13) at the time of the accident, testified that he and his brother had changed positions as they walked along the roadway.

"Q Why did you swap positions?

A Because he said there were cars coming, they might hit us, so he told me to swap with him so I did."

* * * * * *

"Q And told you at the time he asked you to do that the reason he was asking you to do that was so if a car came off the roadway onto the shoulder he would be closest to it, right?

A Yes, sir."

Young Bernardo was examined extensively on direct and cross examination covering the same events that took place immediately prior to the accident over and over again. His testimony was most consistent considering his age. He was asked in effect whether or not his brother, Johnny, saw the car coming. He responded to the following questions:

"Q Did Johnny see the car at the same time you did?

A I don't know.

Q Did you say to Johnny, 'Look, there is a car coming,' or did Johnny say, 'Watch out, Bernardo, there is a car on the shoulder,' the same shoulder you were walking on?

A He might have looked, yes, sir, but he didn't tell me nothing.

Q Which way was Johnny looking?

A In front of him.

Q You were all walking and both looking down the road in front of you?

A Yes, sir."

* * * * * *

"Q He was looking the same direction you were?

A Well, I didn't look at him. I didn't know where he was looking.

Q Had Johnny been looking straight ahead or was he looking to the side or was he turned talking to you?

A No, he wasn't turned talking to me. He had been looking at the cars in the street. He might have been, yes sir, he might have."

Bernardo was asked whether or not Johnny· had said anything to him while he was lying on the ground after the accident. Bernardo said that after about ten minutes, he did talk to his brother. He was then asked these questions.

"Q Did you have any conversation with him that would have indicated to you he either did or did not see the car?

A Yes, sir, he must have seen it because he asked me what had happened. I told him what had happened.

Q In other words he didn't know what had happened?

A No, sir.

Q And this was at a time when he was able to tell the policeman where he was on the shoulder and he remembered everything else except what happened?

A I remember that when we were in the ambulance.

Q You were in the ambulance and he was talking and was rational at that time?

A He couldn't move but he was talking.

Q And he wanted to know what hit him, a train, cow, or car, or what?

A Yes, sir.

Q And from his response is this the first time Johnny knew there had been a car on that shoulder where he was walking?

A Yes, sir."

In brief, Bernardo's testimony was that he saw the car approaching him on the shoulder of the highway. He thought the car was going to go into the drive-in. Rosales, the driver, testified that he first intended to turn into the drive-in. He testified that when he saw the two boys they were about two car lengths away from him. He attempted to get back on the highway but the cars to his rear were beginning to pass him. It was undisputed that the Rosales car was coming fairly fast. When Bernardo looked toward the drive-in and then looked back, the Rosales car was upon him. He was then asked about the time interval in two questions.

"Q And you watched it for a while and then you looked away and you looked back at it and it was still coming toward you?

A At the second time, I saw it, it was already in front of us."

\* \* \* \* \* \*

"Q Then you looked back and the car was still coming down the same shoulder it had been coming down when you first saw it?

A It wasn't coming no more. It came."

Generally speaking, the reaction time has been judicially noticed by our courts under ideal circumstances to be three-fourths ($\frac{3}{4}$) of a second. This is generally true where there is but one decision to make (i. e., such as applying brakes, turning to avoid a collision, etc.). Here, the evidence is clear that the driver, Rosales, first intended to turn from the shoulder on which he was traveling into the drive-in establishment. Bernardo thought this to be true and his glance to the left toward the drive-in did so indicate. However, when the driver discovered the two pedestrians on the shoulder of the highway, his reaction was to turn his car in the opposite direction back toward the highway. At that same time, Johnny was faced with making an instantaneous decision after consideration of three (3) major choices: (1) he could stay where he was if he determined in his own mind that the Rosales car had decided to turn off the shoulder into one of the busi-

**250**

ness establishments; (2) he could stay where he was if he determined in his own mind that the driver of the Rosales car had decided to turn back onto the highway; or (3) he could jump: (a) to the left or (b) to the right, if he determined in his own mind that the driver of the Rosales car had decided to continue his path in a straight direction toward him. Since Bernardo was close to the edge of the shoulder, his decision and choice was easier.

The law requires that a person must keep a proper lookout for his own safety. He is required to keep and maintain that kind of a lookout that a person of ordinary prudence in the exercise of ordinary care would have kept and maintained under the same or similar circumstances. A pedestrian in a situation such as Johnny has a duty to keep a proper lookout for other vehicles and his failure to do so is negligence. But such failure to keep a proper lookout is a proximate cause of the collision only if such lookout would have revealed something to him that if seen would have alerted him to the danger of the accident at such time or distance that proper evasive action taken by him would have prevented the accident. Proper evasive action by Johnny required a sufficient reaction time in which to have made a reflective choice that would have prevented the accident. The reaction time would have been much longer than ¾ of a second.

We hold that there is no evidence that Johnny failed to keep that lookout that the law requires that he should have kept and maintained under the circumstances. However, assuming for the sake of argument, that Johnny did not keep a proper lookout, the record is clear that there is no evidence that his failure was a proximate cause of the accident. There is no evidence that Johnny had sufficient time in which to react and take proper evasive action which would have prevented the accident under the circumstances.

The judgment of the trial court is affirmed.